111 P.3d 148

**L. Darwin McKAY and Patricia McKay, husband and wife, and The Turf Company, LLC, Plaintiffs–Respondents,**

v.

**BOISE PROJECT BOARD OF CONTROL, a/k/a Board of Control, Defendant Appellant.**

No. 28660.

Supreme Court of Idaho, Boise, November 2003 Term.

April 13, 2005.

Moore, Baskin & Parker, Boise, for appellant. Paige A. Parker argued.

Westberg, McCabe & Collins; Bevis, Cameron & Johnson, Boise, for respondents. William D. Collins and James A. Bevis argued.

Norman M. Semanko, Boise, for Amicus Curiae Idaho Water Users Association.

**SUBSTITUTE OPINION. THE COURT'S PRIOR OPINION DATED JULY 22, 2004, IS HEREBY WITHDRAWN.**

BURDICK, Justice.

L. Darwin and Patricia McKay (McKay) and their company, the Turf Company, LLC, brought this action after incurring a crop loss resulting from the flooding of land in the Hubbard Reservoir basin. After a court trial on McKay's claims the district court awarded damages to McKay and issued a permanent injunction. This Court reverses the trial court's permanent injunction, vacates the award of damages to McKay, and remands for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Joan Sterling and her husband, Lance Fleming, purchased the subject land from the State of Idaho in 1967. Fleming no longer has any interest in the land. Located in the Hubbard Reservoir basin, the land is encumbered by a flowage easement held by the Boise Project Board of Control (Project). The land sale certificates indicate that the land "is subject to inundation by waters of Hubbard Reservoir."

In a 1976 action filed by the State of Idaho against the Project, the district court, Hon. W.E. Smith, presiding, entered a stipulation and judgment dated November 1, 1979, which provided that the Project could fill the Hubbard Reservoir to 2,771 feet for routine irrigation operations based on the elevation gauge on Hubbard Dam.

While she owned the land, Sterling did not farm below the 2,771–foot elevation and did not complain of irregular flooding. In 1992, Sterling leased the land to McKay. The lease agreement contained a provision specifically authorizing a reduction in the rent in the event the land was flooded for more than thirty days. McKay planted turf grass as a cash crop on all of the property leased from Sterling.

In January of 1996, McKay approached the Project's Board of Directors about the flooding of his leasehold during the previous year. There was a discussion about a means of

reconciling the Project's continued use of the Hubbard Reservoir while preserving McKay's crop production. In reliance on the 1979 judgment interpreting the Project's flowage easement as a right to flood for "routine irrigation operations," the Board of Directors sent a letter to Sterling as the landowner informing her of the Project's intent to fill the Hubbard Reservoir to the level of 2,766 feet in 1997 and to hold the water there, if conditions allowed.

1997 was an above average water year. In spring 1997, the Project decided to take excess river flow from the Boise River and to fill the reservoir. On about March 18, 1997, the backwater from Hubbard Reservoir began to reach McKay's turf fields. On May 22, 1997, the Project stopped the inflow into the reservoir and measured the maximum level of the water at 2,767.8 feet. The water left McKay's turf fields on approximately May 29, 1997.

As a result of the flooding, McKay brought an action alleging intentional tort, negligence, inverse condemnation and trespass. McKay primarily claimed damages from the Project's negligent use of the flowage easement and intentional trespass of his leasehold. Prior to trial, McKay notified the district court that it would not present any evidence of damage for the inverse condemnation count.

On September 19, 2002, the district court entered its second amended findings of facts, conclusions of law and judgment. The district court sitting without a jury ruled that the Project's conduct in 1997 of raising the level of the reservoir so as to flood McKay's fields was a negligent breach of its duty to exercise the flowage easement in a reasonable manner and in accordance with the 1979 stipulated judgment. The district court rejected the Project's argument that it was entitled to immunity for its conduct, under I.C. § 6–904(1), issued a permanent injunction, and awarded damages to McKay for his losses suffered as a result of the flooding. The injunction effectively changed the scope of the flowage easement from permitting flooding for "routine irrigation operations it may desire" to provide that the Project "may not flood the servient estate, presently leased by [McKay] in filling Hubbard Reservoir except in the good faith pursuit of legitimate irrigation goals." The Project timely appealed the decision of the district court, asserting its right to full use of the flowage easement as decreed in the 1979 judgment, notwithstanding the high seepage rate of the reservoir.

## ISSUES ON APPEAL

I. Did the District Court err in finding McKay in privity with the State of Idaho and thus bound by the 1979 judgment?

II. Did the district court err in finding the Project negligent in the use of the Hubbard Reservoir flowage easement?

III. Is the Project entitled to immunity as provided by Idaho Code § 6–904(1)?

IV. Did the district court err in basing its damage award upon a market share analysis?

## STANDARD OF REVIEW

 A district court's findings of fact in a court-tried case will be liberally construed on appeal in favor of the judgment entered, in view of the district court's role as trier of fact. *Western Heritage Ins. Co. v. Green,* 137 Idaho 832, 835, 54 P.3d 948, 951 (2002) (citing *Conley v. Whittlesey,* 133 Idaho 265, 269, 985 P.2d 1127 (1999); *Lindgren v. Martin,* 130 Idaho 854, 857, 949 P.2d 1061, 1064 (1997)). Review of the decision is limited to ascertaining whether the evidence supports the findings of fact and whether the findings of fact support the conclusions of law. *Id.* If the findings of fact are based on substantial evidence, even if the evidence is conflicting, they will not be overturned on appeal. *Id.* However, this Court exercises free review over questions of law. *Id.*

## ANALYSIS

Hubbard Reservoir was constructed in 1902 by Daniel R. Hubbard in connection with and for the Idaho–Iowa Lateral and Reservoir Company (Idaho–Iowa). The reservoir is supplied by the New York Canal, which was opened for the first time in February of 1909. The Reclamation Service (Bu-

reau of Reclamation) filled the Hubbard Reservoir and it went practically dry in fifteen days. During its early years, the reservoir was used as a waste-way and under certain circumstances as an irrigation storage facility. Prior to turning the reservoir over to the Bureau of Reclamation, Idaho–Iowa started a condemnation proceeding for reservoir purposes in order to store water for irrigation. In 1911, the district court entered an order condemning that property for the construction and maintenance of a reservoir and for such purpose "to completely use, enjoy, and control the same." In 1912, the Idaho–Iowa granted to the United States all its interest in the Hubbard Reservoir.

A second judicial determination of the Hubbard Reservoir easement was begun in 1976 as a result of the State of Idaho's complaint against the Project for alleged damages and trespass because of grazing on the easement. Finally, in 1979, the parties to that litigation settled the dispute and entered into a stipulation, which was reduced to a judgment on November 1, 1979. That judgment reads in part as follows:

11. The Boise Project Board of Control, be, and it is hereby, *restrained from filling* that portion of Hubbard Reservoir lying *above the level of 2771.00*, as measured on the staff gauge on the dam of the Hubbard Reservoir *except in the event of an irrigation emergency*. For the purpose of this order, an irrigation emergency shall exist when, in the sole discretion of the Manager of the Boise Project Board of Control, the integrity of any of the irrigation works operated by the Boise Project Board of Control is threatened with damage in [t]he absence of removal of water from said works by diversion into the Hubbard Reservoir, provided, that the Boise Project Board of Control shall reduce the level of water in said Hubbard Reservoir following any such emergency which reduces the level of the water in the reservoir to the level of 2771.00 on the staff gauge at the maximum rate possible, consistent with good water management practices.

* * *

13. That the Boise Project Board of Control may, *at any time* and without violation of this Order and without any requirement as to notice, except as hereinabove set forth *utilize the reservoir below the level of 2,771.00,* as measured on the staff gauge, *for any routine irrigation operations it may desire;*

14. That all prior injunctive orders issued in the above-entitled matter be, and the same hereby are vacated.

(Emphasis added.) As part of the judgment, the district court also decreed the State of Idaho the fee simple owner of the land under the Hubbard Reservoir and the Bureau of Reclamation the owner of a permanent flowage easement (subject to this decree) to use Hubbard Reservoir being operated by the Project.

## I. DID THE DISTRICT COURT ERR IN FINDING MCKAY IN PRIVITY WITH THE STATE OF IDAHO AND THUS BOUND BY THE 1979 JUDGMENT?

McKay, the respondent herein, asserts lack of privity as an additional issue on appeal and as an alternative argument to affirm the judgment. McKay seeks reversal of the district court's conclusion that McKay was bound by the 1979 Judgment. Therefore we begin by addressing McKay's challenge to the district court's finding of privity, which was an assumption made by the district court to began its analysis under the 1979 judgment. We note there is no question that the Project is bound by the 1979 judgment.

■ We first must determine whether McKay was required to bring a cross-appeal pursuant to I.A.R. 15 or whether the issue of privity is properly raised as an additional issue on appeal.

■ Idaho Appellate Rule 15 states:

Right to cross-appeal. After an appeal has been filed, a timely cross-appeal may be filed from any interlocutory or final judgment, order or decree. If no affirmative relief is sought by way of reversal, vacation or modification of the judgment, order or

decree, an issue may be presented by the respondent as an additional issue on appeal under Rule 35(b)(4) without filing a cross-appeal.

Thus, I.A.R. 15 requires a respondent to file a cross-appeal if affirmative relief by way of reversal, vacation or modification is sought. *Miller v. Board of Trustees*, 132 Idaho 244, 247–48, 970 P.2d 512, 515–16 (1998).

The district court's judgment provides as follows:

Based upon the findings of fact and conclusions of law stated herein it is the judgment of the Court that:

(1) Plaintiffs, McKay, will be compensated for money damages in the amount of $55,939.10; and

(2) A permanent injunction will issue providing as follows:

Defendant may not flood the servient estate, presently leased by Plaintiffs, in filling Hubbard Reservoir except in the good faith pursuit of legitimate irrigation goals. These goals include short-term storage of water (typically less than one week up to 2,665 feet), storage of water in the event of a break in the canal system or for repair of the canal system, or for flood control on the Boise River. The Court recognizes that there may be other irrigation needs presented in the future, but the historic and present needs of the irrigation system are served by the above-listed irrigation operations.

McKay is not seeking reversal of the district court's judgment. There is no mention in the district court's judgment of the 1979 judgment. The judgment is not based upon the district court's finding of fact that McKay is bound by the 1979 judgment. The 1979 judgment included the following provision:

13. That the Boise Project Board of Control, may, at any time and without any violation of this Order and without any requirement as to notice, except as hereinabove set forth utilize the reservoir below the level of 2771.00, as measured on the staff gauge, for any routine irrigation operations it may desire.

The district court held that the Project's filling of the reservoir was not done as part of "routine irrigation operations" and it was therefore not authorized by the 1979 judgment. The district court's judgment was based upon the Project simply exercising its easement in an unreasonable manner. The district court stated:

It is the finding the Court that the [Project] had a duty to exercise the easement in a reasonable manner. The Court further finds that the actions of the [Project] in filling Hubbard Reservoir in the manner it did in the spring of 1997 were not reasonable and constituted a breach of their duty.

The lack of reasonableness was based upon two factors: the high level of water loss through seepage in Hubbard Reservoir and the availability of water storage in Lake Lowell. The district court summarized its basis for finding liability as follows:

The Court finds that the [Project] had a duty to McKay's servient estate. That duty was clearly breached when water was stored upon the lands farmed by the McKays in violation of the 1979 Stipulation and Order and without any reasonable justification.

The district court did not base its finding of liability upon the 1979 judgment. Rather, it found that the Project's conduct was not authorized by that judgment because its conduct in filling the Hubbard Reservoir did not constitute "routine irrigation operations."

In summary as to the issue of the application of I.A.R. 15, McKay is not seeking to reverse or vacate the judgment, nor is McKay seeking a reversal of finding upon which the judgment is based.

■ As I.A.R. 15 presents no bar to this Court considering the issue of privity, we now consider whether McKay was in privity with the State of Idaho and thus bound by the 1979 judgment.

Concerning McKay, the trial court found: [The] McKays argue that they were not bound by Judge Smith's earlier decisions because they were not privy to the action. The Court will find that the McKays' predecessors in interest were clearly privy to

the litigation that occurred in the 1970s. This was property that at the time was owned by the State of Idaho. The State was directly involved in the litigation and Ms. Fleming [now Sterling], who was purchasing land from the State at the time, was privy of the State of Idaho and is bound by the 1979 stipulation.

The district court's finding that McKay was bound by the 1979 judgment is clearly erroneous. The 1979 judgment arises out of a lawsuit started in 1976 between the State of Idaho and the Project. Sterling and Fleming entered into a real estate contract in 1967 to purchase the land. Obviously, the purchase occurred prior to the litigation between the State of Idaho and the Project. Neither Sterling nor Fleming was a party to the 1976 lawsuit and thus they were not bound by the 1979 judgment. Therefore, McKay as Sterling's tenant is also not bound by the 1979 judgment. We find that the district court erred in finding McKay in privity with the State of Idaho.

## II. DID THE DISTRICT COURT ERR IN FINDING THE PROJECT NEGLIGENT IN THE USE OF THE HUBBARD RESERVOIR FLOWAGE EASEMENT?

Finding that privity does not exist, we now turn our attention to whether the Project is liable to McKay for its use of the easement. McKay asserts two theories to find the Project liable. First, the Project violated the provisions of the 1979 Judgment in raising the water level in the spring of 1997. Secondly, McKay argues that the Project did not act reasonably under its easement when it raised the water level.

The district court, sitting without a jury, held the Project liable for negligence in the exercise of its flowage easement based upon two grounds. First, the district court found the 1979 district court decree defining the Project's easement for "routine irrigation purposes" to be ambiguous and then interpreted the language finding the Project's use not to conform with routine irrigation purposes. Second, the district court held the use of Hubbard Reservoir to be an unreasonable irrigation practice because it wasted wa-

ter. We will first determine whether the Project violated the terms of the 1979 judgment and then determine if the Project acted reasonably under its easement.

■ In order to prove negligence, the plaintiff was required to prove the following: A duty recognized by law, requiring the defendant to conform to a certain standard of conduct; breach of that duty; a causal connection between the defendant's conduct and the resulting injuries; and actual loss or damage. *Bramwell v. South Rigby Canal Company,* 136 Idaho 648, 39 P.3d 588 (2001); *Brizendine v. Nampa Meridian Irrigation District,* 97 Idaho 580, 548 P.2d 80 (1976).

### A. Did the Project use the easement in a reasonable manner because it used the easement in a manner consistent with the 1979 judgment?

McKay does not challenge the existence of the easement. The land sale certificate indicated that the land in question "is subject to inundation by waters of Hubbard Reservoir." The 1979 judgment limits the inundation. Therefore, the scope of the Project's easement is limited by the 1979 judgment, even though McKay is not subject to that judgment.

The district court held that the 1979 judgment was ambiguous. To resolve the ambiguity, the district court analyzed the historical use of the reservoir. The district court then found that the use in 1997 was not consistent with the historical use as decreed in 1979: "alleviating flooding ... repair on the canal system downstream.... Additionally ... stored water for short periods of time—usually three-four days...." Because the Project's use did not meet the historical use of flood control, casual repair or short-term use, the district court concluded that the use in 1997, therefore, was unreasonable.

■ Determination of whether a writing is ambiguous is a question of law for the court. *City of Chubbuck v. City of Pocatello,* 127 Idaho 198, 899 P.2d 411 (1995). Ambiguity results when reasonable minds might differ or be uncertain as to its meaning, however ambiguity is not established merely

because different possible interpretations are presented to a court. *State v. Browning,* 123 Idaho 748, 852 P.2d 500 (Ct.App.1993). This Court finds that the language of the 1979 judgment was not ambiguous.

In finding the language of the 1979 judgment ambiguous, the district court commented:

> The court cannot glean from the face of the stipulation or supporting documents what the parties specifically meant by "routine irrigation operations." Judge Smith in his earlier decision had clearly focused upon the duty of the dominant estate in relationship to the servient estate and had also focused on historical use of the flowage easement.

The reference to Judge Smith's earlier decision came from a portion of a memorandum decision dated July 11, 1978, wherein the judge stated:

> This Court must then conclude that the flowage easement involved in this case may only be exercised for the purposes of irrigation. The defendants may not flood the land of the plaintiffs except in the good faith pursuant of permissible irrigation goals. When exercising their right to flood the plaintiff's lands the defendants operate under a duty imposed by law to avoid unnecessary damage to the servient estate or unnecessary interference with the legitimate use of the servient estate by the plaintiff and their privies. Any intentional or malicious use of the easement for the purpose of flooding plaintiff's well and pump or otherwise interfering with the plaintiff's use of the land shall be unlawful. The evidence in this case indicates that irrigation purposes have rarely required full exercise of the easement in the past but it cannot be said that future conditions will not produce a bona fide reasons for full use of the reservoir.
>
> Accordingly, the injunction should be modified. The defendants should be enjoined from any intentional, malicious flooding of the reservoir for the purpose of destroying plaintiff's property or interfering with the plaintiff's use of the property. Defendant's use of the easement should be limited to the good faith exercise of their flowage rights in pursuant of legitimate irrigation purposes. When so modified the injunction shall operate as an added protective measure supplementing any cause of action which the plaintiff may have for misuse of the easement, trespass, or tort resulting from any unlawful interference. The existence of damage actions in such cases do not preclude injunctive protection and the remedies available for any malicious or otherwise wrongful acts of flooding are cumulative. . . .

It is thus plain that Judge Smith meant the Project Board could use the reservoir for purposes of irrigation and that the Project was enjoined only from any intentional, malicious flooding of the reservoir for the purposes of destroying the plaintiff's property.

Irrespective of Judge Smith's memorandum decision, the parties subsequently entered into a stipulation that was reduced to a judgment by Judge Smith and entered on November 1, 1979. The Judgment gave the Project the right to fill the reservoir to the 2,771–foot elevation level at any time and without any requirement as to notice for any routine irrigation operations it may desire.

Judge Smith had examined the historical use of the Hubbard Reservoir because the case before him dealt with the ownership rights of the Bureau of Reclamation and the State of Idaho, as well as other lessees of the Project and their rights to use the land subject to inundation by Hubbard Reservoir. During that litigation, there were many allegations and some findings that the Project had intentionally misused its easement by allowing for-fee grazing. Judge Smith ruled the Bureau of Reclamation owned the flowage easement that the Project was using, but he held that the underlying land belonged to the State of Idaho.

The district court in this case found the 1979 judgment language, "routine irrigation operations," ambiguous and further applied a historical use analysis much as Judge Smith did in the 1970's, which was not necessary in this case. The district court here had to resolve whether the use of the easement by the dominant estate, as defined by Judge Smith and in light of actual notice to the

servient estate of the dominant estate's use of the easement, was reasonable within the plain meaning of "routine irrigation operations." There was no finding of intentional or malicious flooding of the reservoir in this case.

 As this Court has previously held:

> Construction of the meaning of a contract begins with the language of the contract. "If the contract's terms are 'clear and unambiguous,' the determination of the contract's meaning and legal effect are questions of law .... and the meaning of the contract and intent of the parties must be determined from the plain meaning of the contract's own words." If, however, the contract is determined to be ambiguous, "the interpretation of the document is a question of fact which focuses upon the intent of the parties."

*Albee v. Judy*, 136 Idaho 226, 230, 31 P.3d 248, 252 (2001) (citations omitted). In determining whether a contract is ambiguous, this Court ascertains whether the contract is "reasonably subject to conflicting interpretation." *Bondy v. Levy*, 121 Idaho 993, 996, 829 P.2d 1342, 1345 (1992). "The determination and legal effect of a contractual provision is a question of law where the contract is clear and unambiguous, and courts cannot revise the contract in order to change or make a better agreement for the parties." *Id.* at 997, 829 P.2d at 1346. Questions of law are reviewed by the Court *de novo*. *Id.*

In *Sherwood v. Carter*, 119 Idaho 246, 254, 805 P.2d 452, 460 (1991), this Court stated:

> The word "ordinary," as defined in *Webster's Seventh Collegiate Dictionary* means "routine, normal." *Black's Law Dictionary (6th ed.)* defines "ordinary" as "usual, common, customary, reasonable, not characterized by peculiar or unusual circumstances."

The language, "routine irrigation operations," does not appear to be subject to conflicting interpretations. It seems to allow the Project to conduct ordinary or normal irrigation operations. The word "routine" does not mean that only the historical use or historical operation of the Hubbard Reservoir may be performed by the Project. Rather, any "usual, common, customary [or] reasonable" irrigation operation may be performed by the Project. *See id.* The phrase "routine irrigation operations" has a different connotation than routine irrigation purpose. The word "operation" has a broader connotation, including all of the management decisions, repair functions, and other support activities, which result in the actual irrigation of fields.

The 1979 judgment clearly allows the Project at any time without notice to utilize the reservoir for any "routine irrigation operations." The filling of a storage reservoir for purposes of this judgment is a routine irrigation operation. Additionally, because the district court found there was water in 1997 that was used for downstream irrigation, there is evidence of actual irrigation purpose. The term, "it may desire," plainly means the Board may decide the irrigation operations it felt necessitated the filling of the reservoir.

 It is well established in this jurisdiction that an easement is the right to use the land of another for a specific purpose. *Abbott v. Nampa School Dist. No. 131*, 119 Idaho 544, 548, 808 P.2d 1289, 1293 (1991). The easement owner is entitled to full enjoyment of the easement. *Carson v. Elliott*, 111 Idaho 889, 890, 728 P.2d 778, 779 (Ct.App. 1986). To the degree privileges are expressly granted, the easement owner's rights are paramount to those of the servient owner. *Boydstun Beach Assoc. v. Allen*, 111 Idaho 370, 376–77, 723 P.2d 914, 920–21 (Ct.App. 1986). Every easement is a particular easement, privileging the owner thereof to make particular uses of a servient estate. The more precise the express language of the easement, the more certainty there is regarding the specific privileges granted. *Id.*

As between the State and Spencer and therefore McKays, the flowage easement for the Hubbard Reservoir is an express easement; it was established in the land sale certificate between the State of Idaho and the Spencers, and was modified by the 1979 judgment of Judge Smith. The 1979 judgment allows that Hubbard Reservoir may be filled to the elevation of 2,771 feet at any time for any "routine irrigation operations" the Project may desire. The filling of a

reservoir based upon the normal, routine operating procedures of an irrigation district is for an irrigation purpose. The district court in fact found that a portion of the water in the Hubbard Reservoir was used for irrigation in 1997, while recognizing that there may be other benefits to the use of the reservoir, *i.e.,* recreation, seepage, and storage of water for purposes other than irrigation.

In this case, the servient estate had actual knowledge of inundation to the 2,771–foot elevation and of the intent of the Project to use the reservoir to the 2,766–foot elevation in 1997. With that notice, McKay continued to plant turf grass. Planting grass with this notice below the 2771 foot level was at McKay's own risk. This is especially so when the easement precisely defines the level to which the reservoir may be used for irrigation operations and the servient estate owner has actual knowledge of the prospective use for the water year. Although the planting of a crop did not interfere with the filling of the reservoir, the servient estate did so at its own risk. The respondent argues assumption of the risk does not apply in negligence cases any longer in this state. They are right. However, the issue here is the use of one's own property with knowledge your full property right is limited by an easement. Here McKay used his property on an assumption the dominant estate's rightful use would not unduly injure him. He took a calculated risk and lost.

In *Boydstun Beach Assoc. v. Allen, supra,* the Court of Appeals quoted 5 RESTATEMENT OF PROPERTY, SERVITUDES § 486 (1944):

The possessor of land subject to an easement created by conveyance is privileged to make such uses of the servient tenement as are not inconsistent with the provisions of the creating conveyance.

Here, the Project filled the reservoir below the 2,771 foot level for a use consistent with routine irrigation operations. Therefore, we find the Project acted within the scope of its easement pursuant to the land sale certificate between the State of Idaho and the Spencers, later clarified by the 1979 judgment.

## B. Did the Project act reasonably in its use of the easement?

The district court held that the use of Hubbard Reservoir to be an unreasonable irrigation practice because it wasted water. Specifically, the district court found that only about six percent of the water had been used by downstream irrigation users and that approximately eighty percent of the reservoir's capacity was lost through percolation. The district court further found that Lake Lowell was available to the Project for storing excess river flow as an alternative to filling Hubbard Reservoir. Of particular significance, the district court determined that filling Hubbard Reservoir violated Idaho's policy against wasting water, expressed in I.C. § 18–4302 and other code sections.

Although the 1979 judgment is not binding upon Spencer or McKay, the Project must conform its conduct to that judgment which provides for the filling of the reservoir by the Project to a level of 2,771 feet [deleted coma] for any routine irrigation operations it may desire. The district court's findings, however, indicate that the district court substituted its judgment regarding the reasonableness of the Project's use of the flowage easement for the discretion conferred to the Project by the express terms of the easement. As we previously held, *infra,* the filling of the Hubbard Reservoir was a routine irrigation operation; and the Project cannot be found to be negligent therefore.

McKay raised the issue of waste, asserting that use of the easement that resulted in waste was *per se* a breach of the Project's duty to use the easement reasonably. The district court agreed, identifying various statutes, which proscribe waste as a matter of policy in Idaho, as the source of that duty. Idaho Code § 18–4302 provides: "any person or persons who shall willfully and wantonly waste any of the waters of any stream, the waters of which are used for irrigation, to the detriment of any claimant of the water for irrigation purposes ... are guilty of a misdemeanor." The damages alleged by McKay stem from the Project filling the reservoir with water, not from any resulting waste of that water. The fact the use of

the water is wasteful did not increase the burden of using the flowage easement to the servient estate (McKay). The owner of an easement is not liable for injuries resulting from the ordinary use of the easement as a use reasonable within the terms of the easement. *Rehwalt v. American Falls Reservoir Dist. No. 2*, 97 Idaho 634, 550 P.2d 137 (1976). By this holding, we do not condone the waste of water.

 As operator of the diversion and storage system, the Project is "not an insurer against all damages arising from [its storage system] but is liable when negligent in the construction, maintenance and operation thereof." *Kunz v. Utah Power & Light Co.*, 117 Idaho 901, 906, 792 P.2d 926, 931 (1990) (citation omitted). The Project filled the Hubbard Reservoir for routine irrigation purposes and other beneficial uses and did not exceed the prescribed limitations of the easement. When the irrigation reservoir was filled to that level, McKay nevertheless planted a cash crop below the 2,771–foot prescribed limit and requested damages for the resultant loss of his crop. Nothing contained in this evidence shows the Project did anything other than use the reservoir for its ordinary use (storage of water) or use it reasonably within the terms of its original grant ("inundation by waters of the Hubbard Reservoir" or the November 1, 1979 Judgment) or any reason to protect persons or property from the hazards naturally connected with that use (filling to 2771 feet). *Coulsen v. Aberdeen–Springfield Canal Co.*, 47 Idaho 619, 631, 277 P. 542, 546 (1929). In that the Project used its defined flowage easement in the Hubbard Reservoir for the purpose for which it was created, we conclude that there was no breach of a duty owed to the servient estate under these circumstances and thus no negligence on the part of the Project.

We find the language of the easement unambiguous and hold that the Project reasonably acted within the confines of the easement. Accordingly, we reverse the district court's finding that the Project was negligent in its use of the easement.

## CONCLUSION

Having held that the Project was not negligent nor unreasonable in the use of the flowage easement, we need not discuss the remaining issues raised on appeal. We reverse the judgment of the district court and remand with instructions to dismiss the case. Costs to the appellant.

Chief Justice SCHROEDER and Justices TROUT, EISMANN and KIDWELL, Pro Tem concur.